# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

JOHN T. SMITH,                          :
                                        :
          Plaintiff,                    :     Civil Action No.:    07-1045 (RMU)
                                        :
          v.                            :     Re Document No.:  16
                                        :
JANET A. NAPOLITANO,[1]                 :
in her official capacity as Secretary   :
of the U.S. Department of               :
Homeland Security,                      :
                                        :
          Defendant.                    :

## MEMORANDUM OPINION

### Granting the Defendant's Motion for Summary Judgment

## I. INTRODUCTION

This matter is before the court on the defendant's motion for summary judgment. The plaintiff, a longtime employee of the defendant, alleges that he was discriminated against on the basis of his age in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621 *et seq.*, when he was not selected for either of two supervisory positions to which he applied in April 2006. The plaintiff further alleges that he was not selected for the second of these supervisory positions in retaliation for engaging in protected activity in response to his non-selection for the first position. The defendant has moved for summary judgment.

The court concludes that the plaintiff has failed to raise a genuine issue of fact concerning whether the defendant's proffered non-discriminatory justification – that he was not the most

---

[1]     The court substitutes the current Secretary of the Department of Homeland Security, Janet A. Napolitano, for her predecessors J. David Paulison and Michael Chertoff, who were previously named defendants in this action. *See* Fed. R. Civ. P. 25(d) (stating that an "officer's successor is automatically substituted as a party" when the officer ceases to hold office).

qualified candidate for either position – is pretext masking a discriminatory or retaliatory motive. Accordingly, the court grants the defendant's motion for summary judgment.

## II.  FACTUAL & PROCEDURAL BACKGROUND

In October 1983, the plaintiff, who was born in 1942, began work as an Emergency Management Specialist with the Fire Administration of the Federal Emergency Management Agency ("FEMA").[2]  Pl.'s Opp'n at 1-3; Def.'s Mot. at 2 & Ex. 2 ("Pl.'s Resume") at 2-3.  In November 1989, the plaintiff transferred to FEMA's Preparedness Directorate, whose mission appears to have been focused on assisting local governments develop systems for responding to natural disasters.[3]  See Pl.'s Opp'n at 3-5; Pl.'s Resume at 2-3.  While employed in the Preparedness Directorate, the plaintiff spearheaded the Comprehensive HAZMAT Emergency Response – Capability Assessment Program ("CHER-CAP"), "a program developed to aid local government [in] preparing a comprehensive community response to a major event using a HAZMAT incident as a teaching tool."  Pl.'s Resume at 2.  The CHER-CAP program was implemented "in over 100 communities [and] cities including the District of Columbia."  Id. at 3.

---

[2]     The plaintiff does not offer a counter-presentation of the events leading up to his non-selection, nor does he contest the defendant's presentation of these events.  See generally Pl.'s Opp'n. Accordingly, the court relies on the defendant's motion papers to the extent necessary to provide a factual background.  See DeMartino v. FBI, 511 F. Supp. 2d 146, 151 (D.D.C. 2007) (holding that the "[p]laintiff does not contest, and therefore concedes, defendants' facts in support of summary judgment"); see also LCvR 7(h) (allowing the court to treat the movant's statement of material facts as conceded if the facts in a motion for summary judgment are not contested by the non-moving party).

[3]     The parties offer precious little insight into the roles and responsibilities of the various sub-agency divisions, branches and entities involved in this case, apparently litigating under the assumption that the court possesses some intrinsic knowledge of the inner workings of FEMA bureaucracy.  The court has therefore been forced to scour the parties' submission for information from which to cobble together its understanding of these basic matters, which are not themselves in dispute but are necessary to place the matters in dispute in a proper context.

The focus of the government's preparedness efforts, and concomitantly the plaintiff's duties, changed dramatically in response to the terrorist attacks of September 11, 2001. Def.'s Mot. at 3 & Ex. 1 ("Pl.'s Dep.") at 49, 51-59. CHER-CAP ceased to exist and its funding was redirected to preparedness for acts of terrorism. *Id*. at 49, 51. These terrorism preparedness efforts were led by the newly-formed Department of Homeland Security ("DHS") rather than FEMA. *Id*. at 57. As the plaintiff testified, "[i]t became pretty obvious to me that there was a new order with DHS in town and what I was doing to prepare state and local governments for disasters was not in fashion. The thing that was in fashion was to get them ready for terrorist attacks." *Id*. With CHER-CAP at an end, the plaintiff's duties shifted to representing FEMA on an entity called the National Response Team. *Id*. at 58-59; *see* Pl.'s Opp'n at 4.

In September 2004, the plaintiff was appointed to a 120-day detail as Acting Chief of the Preparedness Branch within the Preparedness Directorate. Def.'s Mot. at 4; Pl.'s Opp'n at 3. The vacancy was created by the promotion of David Garratt, who was elevated to the position of Acting Director of the Preparedness Directorate and who recommended that the plaintiff take over his former position. Def.'s Mot. at 4; Pl.'s Opp'n at 3. As Acting Branch Chief, the plaintiff was responsible for all management and preparedness activities of the branch and had supervisory responsibility over five employees. Pl.'s Dep. at 83-84; Pl.'s Resume at 2; Pl.'s Opp'n at 3. The plaintiff was temporarily elevated from a GS 14 to a GS 15 grade level for the duration of the detail. *See* Def.'s Mot. at 4-5.

The plaintiff acknowledges that he received some critical performance reviews during his tenure as Acting Branch Chief. Pl.'s Opp'n at 3 n.1. For instance, Garratt determined that the plaintiff's performance as Acting Branch Chief was, at least at times, "less than expected." Def.'s Mot. at 5-6; *see* Pl.'s Opp'n at 3 n.1. Garratt specifically testified about the particularly

poor showing of the Preparedness Branch on one assignment undertaken under the plaintiff's leadership. Def.'s Mot. at 5-6; *see* Pl.'s Opp'n at 3 n.1. The plaintiff notes, however, that at the time of his year end review, he had addressed these areas of concern and received a satisfactory rating. Pl.'s Opp'n at 3 n.1. In January 2005, the plaintiff's temporary detail as Acting Branch Chief came to an end. Pl.'s Resume at 2; Def.'s Mot. at 6. The plaintiff, however, chose to continue as Acting Branch Chief on a voluntary basis even after he was returned to a GS 14 grade level. Pl.'s Dep. at 99-101.

In January 2006, while the plaintiff was still serving as Acting Branch Chief on a voluntary basis, Albert Fluman joined FEMA as the Acting Director of the Preparedness Directorate. Def.'s Mot. at 6 & Ex. 5 ("Fluman Dep.") at 92. As Acting Director, Fluman was responsible for all preparedness activities of FEMA. Fluman Dep. at 95. His principal duty, however, was to direct the implementation of the National Incident Management System ("NIMS"). Def.'s Mot. at 6-7; Fluman Dep. at 95.

Given the centrality of NIMS to this case, it is striking that neither party bothers to explain precisely what NIMS is or does. *See generally* Def.'s Mot.; Pl.'s Opp'n; Def.'s Reply. The court, however, gathers from the parties' submissions that NIMS refers to a body of rules, standards and best practices to be developed by FEMA to guide local governments in their disaster response preparation efforts. *See generally* Def.'s Mot.; Pl.'s Opp'n; Def.'s Reply. NIMS implementation required both the development of national standards for local response preparedness as well as mechanisms for measuring the compliance of local governments to these standards. *See* Def.'s Mot. at 7-8.

In furtherance of his duty to implement NIMS, Fluman created two positions: (1) Chief of the Compliance and Technical Assistance Branch ("the VA 221 position") and (2) Chief of

the Standards and Technology Branch ("the VA 228 position").  Def.'s Mot. at 7; Pl.'s Opp'n at 4-5.  The VA 221 position focused primarily on the compliance aspect of NIMS implementation.  *See* Def.'s Mot. at 7; Pl.'s Opp'n at 4.  The individual selected for that position would supervise the development of "national program guidelines, policies, plans and procedures to ensure compliance with . . . NIMS."  Def.'s Mot. at 7; *see* Pl.'s Opp'n at 4.  The VA 221 position also entailed responsibility for "[e]stablish[ing] mechanisms to coordinate with DHS, other Federal agencies . . . and other stakeholders to effectively and efficiently define, develop . . . and promulgate NIMS related compliance requirements."  Def.'s Mot., Ex. 9  ("the VA 221 Announcement") at 1.

The VA 228 position, on the other hand, focused primarily on the standards-setting aspect of NIMS implementation.  Def.'s Mot. at 7; Pl.'s Opp'n at 5.  The individual selected for that position would "be responsible for integrating the incident management science and technology needs to promote capability among national level standards."  Def.'s Mot., Ex. 14 ("the VA 228 Announcement") at 1.  The selectee would also serve as FEMA's "technical authority in the formulation of national program guidelines, policies, plans and programs to provide effective implementation of programs and to ensure compliance with . . . NIMS."  *Id*. at 1-2.

Fluman forwarded descriptions of the two positions to FEMA's Human Resources Department, who, together with managers at FEMA, developed knowledge, skills and abilities ("KSA") questions to evaluate candidates for each position.  Def.'s Mot. at 8.  The vacancies were posted on April 18, 2008.  *Id*. at 35-36.  Candidates were instructed to submit their KSA responses and other application materials to the Human Resources Department, who would review these materials and develop a list of most qualified candidates.  *Id*. at 9.  The list of best

qualified candidates would then be forwarded to the selecting official (in this case Fluman) on a document called a Merit Promotion Certificate. *See id.*

The plaintiff applied for both positions. Pl.'s Opp'n at 4-5. The hiring for the VA 221 position proceeded first. *See id.* at 37-38. FEMA's Human Resources Department determined that based on his application materials, the plaintiff was among the ten most qualified candidates for the VA 221 position. Def.'s Mot. at 9; Pl.'s Opp'n at 4. Yet after receiving the list of most qualified candidates, Fluman determined that interviews were unnecessary and hired another individual, James Mullikin, for the position. Def.'s Mot. at 10; Pl.'s Opp'n at 14-18. Mullikin was a DHS employee detailed to FEMA specifically to assist in the compliance aspect of NIMS implementation. Def.'s Mot. at 10; *see also* Pl.'s Opp'n at 5-10. The defendant contends that Mullikin was "by far" the most qualified candidate for the position. Def.'s Mot. at 10. At the time of his selection, Mullikin was 48 years old, while the plaintiff was 64. Pl.'s Opp'n. at 1, 5.

Soon after being passed over for the VA 221 position, the plaintiff contacted a FEMA EEO counselor to complain of what he perceived as age discrimination in the selection of Mullikin. *Id.* at 2. The plaintiff also allegedly confronted Fluman directly regarding his non-selection. Def.'s Mot. at 11-12. On June 7, 2009, an EEO counselor contacted Fluman, who was advised that an anonymous individual had complained about the hiring of the VA 221 position. Pl.'s Opp'n. at 2.

At approximately the same time, FEMA's Human Resources Department was reviewing the application materials for candidates for the VA 228 position. *See id.* The plaintiff again was placed on the list of the ten best qualified candidates. Def.'s Mot. at 12-13. Fluman, however, chose not to interview the plaintiff. *Id.* Instead, Fluman chose to interview two individuals, Tracy Haynes and James Carnegis. Def.'s Mot at 12-13. Each man was under 50 years old at

the time.  *Id*. at 13.  Fluman formed an interview panel comprised of himself, his deputy Carol Cameron and John Rhodes, a FEMA consultant and expert in the area of standards.  *Id*.  On June 9, 2006, Haynes was selected for the VA 228 position.  *Id*. at 13-14; Pl.'s Opp'n at 12-13.

On June 8, 2007, the plaintiff commenced this action in the district court.  Following extensive discovery, the defendant filed this motion for summary judgment.

### III.  ANALYSIS

### A.  Legal Standard for a Motion for Summary Judgment

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  FED. R. CIV. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Diamond v. Atwood*, 43 F.3d 1538, 1540 (D.C. Cir. 1995).  To determine which facts are "material," a court must look to the substantive law on which each claim rests.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A "genuine issue" is one whose resolution could establish an element of a claim or defense and, therefore, affect the outcome of the action.  *Celotex*, 477 U.S. at 322; *Anderson*, 477 U.S. at 248.

In ruling on a motion for summary judgment, the court must draw all justifiable inferences in the nonmoving party's favor and accept the nonmoving party's evidence as true.  *Anderson*, 477 U.S. at 255.  A nonmoving party, however, must establish more than "the mere existence of a scintilla of evidence" in support of its position.  *Id.* at 252.  To prevail on a motion for summary judgment, the moving party must show that the nonmoving party "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on

which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.  By pointing to

the absence of evidence proffered by the nonmoving party, a moving party may succeed on

summary judgment.  *Id.*

The nonmoving party may defeat summary judgment through factual representations

made in a sworn affidavit if he "support[s] his allegations . . . with facts in the record," *Greene v.*

*Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999) (quoting *Harding v. Gray*, 9 F.3d 150, 154 (D.C. Cir.

1993)), or provides "direct testimonial evidence," *Arrington v. United States*, 473 F.3d 329, 338

(D.C. Cir. 2006).  Indeed, for the court to accept anything less "would defeat the central purpose

of the summary judgment device, which is to weed out those cases insufficiently meritorious to

warrant the expense of a . . . trial." *Greene*, 164 F.3d at 675.

### B.  Legal Standard for Discrimination under the ADEA

In the recent decision *Goss v. FBL Financial Servs., Inc*., the Supreme Court held that "a

plaintiff bringing a disparate treatment claim pursuant to the ADEA must prove, by a

preponderance of the evidence, that age was the 'but for' cause of the challenged adverse

employment action." 557 U.S. ___, ___ (2009) (citing *Reeves v. Sanderson Plumbing Products,*

*Inc*., 530 U.S. 133, 141, 143 (2000) (holding that "the plaintiff's age must have 'actually played

a role in [the employer's decisionmaking] process and had a determinative influence on the

outcome'")).  In assessing whether the plaintiff has met this burden, courts are guided by a three-

part burden-shifting analysis known as the *McDonnell Douglas* framework.  *Lathram v. Snow*,

336 F.3d 1085, 1088 (D.C. Cir. 2003); *Morgan v. Fed. Home Loan Mortgage Corp.*, 328 F.3d

647, 651 (D.C. Cir. 2003) (applying the *McDonnell Douglas* framework to a Title VII retaliation

claim).  The Supreme Court explained the framework as follows:

> First, the plaintiff has the burden of proving by the preponderance of the evidence
> a prima facie case of discrimination.  Second, if the plaintiff succeeds in proving

the prima facie case, the burden shifts to the defendant "to articulate some
legitimate, nondiscriminatory reason for the employee's rejection" . . . .  Third,
should the defendant carry this burden, the plaintiff must then have an opportunity
to prove by a preponderance of the evidence that the legitimate reasons offered by
the defendant were not its true reasons, but were a pretext for discrimination . . . .
The ultimate burden of persuading the trier of fact that the defendant intentionally
discriminated against the plaintiff remains at all times with the plaintiff.

*Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981) (internal citations omitted)

(quoting *McDonnell Douglas v. Green*, 411 U.S. 792, 802 (1973)); *see Chappell-Johnson v.*

*Powell*, 440 F.3d 484, 487-88 (D.C. Cir. 2006) (applying the *McDonnell Douglas* framework in

analyzing a claim brought under the ADEA); *accord Hall v. Giant Food, Inc.*, 175 F.3d 1074,

1077 (D.C. Cir. 1999).

To establish a prima facie case of age discrimination under the ADEA, the plaintiff must

demonstrate "facts sufficient to create a reasonable inference that age discrimination was a

determining factor in the employment decision." *Cuddy v. Carmen*, 694 F.2d 853, 856-57 (D.C.

Cir. 1982); *Miller v. Lyng*, 660 F. Supp. 1375, 1377 (D.D.C. 1987).  Such an inference is created

if the plaintiff can show (1) he belongs to the statutorily protected age group; (2) he was

qualified for his position and was performing his job well enough to meet his employer's

legitimate expectations; (3) he suffered an adverse employment action despite his qualifications

and performance; and (4) he was disadvantaged in favor of similarly situated younger

employees.  *Reeves*, 530 U.S. at 142; *Hall*, 175 F.3d at 1077; *Paquin*, 119 F.3d at 26 (citing

*Coburn v. Pan Am. World Airways, Inc.*, 711 F.2d 339, 342 (D.C. Cir. 1983)).

"The burden of establishing a prima facie case of disparate treatment is not onerous."

*Burdine*, 450 U.S. at 253.  If the plaintiff establishes a prima facie case, a presumption then

arises that the employer unlawfully discriminated against the employee. *Id.* at 254.  To rebut this

presumption, the employer must articulate a legitimate, non-discriminatory reason for its action.

*Id.* The employer "need not persuade the court that it was actually motivated by the proffered reasons." *Id.* Rather, "[t]he defendant must clearly set forth, through the introduction of admissible evidence, reasons for its actions which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502 (1993).

If the employer successfully presents a legitimate, non-discriminatory reason for its actions, "the McDonnell Douglas framework – with its presumptions and burdens – disappears, and the sole remaining issue is discrimination *vel non*." *Lathram*, 336 F.3d at 1088 (internal citations omitted); *Brady v. Office of the Sergeant at Arms, U.S. House of Representatives*, 520 F.3d 490, 494 (D.C. Cir. 2008) (noting that "the prima facie case is a largely unnecessary sideshow"). The district court need resolve only one question: "Has the employee produced sufficient evidence for a reasonable [factfinder] to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis" of his or her protected status? *Brady*, 520 F.3d at 494 (D.C. Cir. 2008); *see Chappell-Johnson v. Bair*, 574 F. Supp. 2d 103, 106 (D.D.C. 2008) (observing that the principles articulated *Brady* apply equally in the ADEA context); *accord Simpson v. Leavitt*, 557 F. Supp. 2d 118, 126-27 (D.D.C. 2008). The court must consider whether the [factfinder] could infer discrimination from (1) the plaintiff's prima facie case, (2) any evidence the plaintiff presents to attack the employer's proffered explanation, and (3) any further evidence of discrimination that may be available to the plaintiff. *Waterhouse v. District of Columbia*, 298 F.3d 989, 992-93 (D.C. Cir. 2002) (quoting *Aka*, 156 F.3d at 1289). The plaintiff need not present evidence in each of these categories in order to avoid summary judgment. *Aka*, 156 F.3d

at 1289.  Rather, the court should assess the plaintiff's challenge to the employer's explanation in light of the total circumstances of the case.  *Id.* at 1291.

### C.  Legal Standard for Retaliation

The framework for analyzing a retaliation claim is largely identical to that applicable in the ADEA context.  As with an ADEA claim, to prevail on a claim of retaliation, a plaintiff must follow the three-step *McDonnell Douglas* framework.  *Morgan v. Fed. Home Loan Mortgage Corp.*, 328 F.3d 647, 651 (D.C. Cir. 2003) (applying the *McDonnell Douglas* framework to a Title VII retaliation claim); *Duncan v. Wash. Metro. Area Transit Auth.*, 214 F.R.D. 43, 49-50 & n.8 (D.D.C. 2003) (applying the *McDonnell Douglas* framework to a Rehabilitation Act retaliation claim).

To establish a prima facie case of retaliation, a plaintiff must show that (1) he engaged in a statutorily protected activity, (2) a reasonable employee would have found the challenged action materially adverse,[1] and (3) there existed a causal connection between the protected activity and the materially adverse action.  *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67-69 (2006); *see also Scott v. Kempthorne*, 2006 WL 1980219, at *3 (10th Cir. July 17, 2006).  The plaintiff's burden is not great: he "merely needs to establish facts adequate to permit an inference of retaliatory motive."  *Forman v. Small*, 271 F.3d 285, 299 (D.C. Cir. 2001).

If the employer successfully presents a legitimate, non-retaliatory reason for its actions, "the presumption raised by the prima facie is rebutted and drops from the case," *Hicks*, 509 U.S.

---

[1]  In the retaliation context, the term "adverse action" "encompass[es] a broader sweep of actions than those in a pure discrimination claim."  *Baloch v. Kempthorne*, 550 F.3d 1191, 1198 n.4 (D.C. Cir. 2008).  Thus, "[r]etaliation claims are 'not limited to discriminatory actions that affect the terms and conditions of employment' and may extend to harms that are not workplace-related or employment-related so long as 'a reasonable employee would have found the challenged action materially adverse.'"  *Id.* (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 64, 68 (2006)).

at 507, and the district court need resolve only one question: "Has the employee produced

sufficient evidence for a reasonable [factfinder] to find that the employer's asserted non-

[retaliatory] reason was not the actual reason and that the employer intentionally [retaliated]

against the employee on the basis of race, color, religion, sex, or national origin?" *Brady*, 520

F.3d at 494.  In other words, did the plaintiff "show *both* that the reason was false, *and* that . . .

[retaliation] was the real reason." *Weber*, 494 F.3d at 186 (alterations in original and internal

quotations omitted) (quoting *St. Mary's Honor Ctr.*, 509 U.S. at 515).  The court must consider

whether the factfinder could "infer [retaliation] from the plaintiff's prima facie case and any

other evidence the plaintiff offers to show that the actions were [retaliatory] or that the non-

[retaliatory] justification was pretextual." *Smith v. District of Columbia*, 430 F.3d 450, 455

(D.C. Cir. 2005) (quoting *Murray v. Gilmore*, 406 F.3d 708, 713 (D.C. Cir. 2005)).  The court

should assess the plaintiff's challenge to the employer's explanation in light of the totality of the

circumstances of the case.  *Aka*, 156 F.3d at 1291.

The strength of the plaintiff's prima facie case, especially the existence of a causal

connection, can be a significant factor in his attempt to rebut the defendant's legitimate non-

retaliatory reason for the adverse action.  *See Aka*, 156 F.3d at 1289 n.4 (stating that "a *prima

facie* case that strongly suggests intentional discrimination may be enough by itself to survive

summary judgment"); *Laurent v. Bureau of Rehab., Inc.*, 544 F. Supp. 2d 17, 23 n.5 (D.D.C.

2008) (holding that the plaintiff cannot establish pretext because "she is unable to show any

causal connection"); *Meadows v. Mukasey*, 2008 WL 2211434, at *5-6 (D.D.C. May 29, 2008)

(holding that the plaintiff demonstrated pretext in part by establishing a causal connection).  The

plaintiff may establish a causal connection "by showing that the employer had knowledge of the

employee's protected activity, and that the [retaliatory] personnel action took place shortly after

that activity." *Cones v. Shalala*, 199 F.3d 512, 521 (D.C. Cir. 2000) (quoting *Mitchell v. Baldrige*, 759 F.2d 80, 86 (D.C. Cir. 1985)); *accord Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (noting that the temporal connection must be "very close": a three- or four-month period between an adverse action and protected activity is insufficient to show a causal connection, and a twenty-month period suggests "no causality at all").

### D.  The Plaintiff's Evidence of Discrimination and Retaliation

There is no dispute that the defendant has articulated a legitimate, non-discriminatory and non-retaliatory justification for the plaintiff's non-selection – namely, that the plaintiff was passed over because he was not the most qualified candidate for either of the two positions. *See* Def.'s Mot. at 9-16; Pl.'s Opp'n at 28-33, 39-40.  Thus, the court foregoes an examination of the plaintiff's prima facie case and turns directly to the central issue – whether the plaintiff has produced sufficient evidence for a reasonable factfinder to conclude that the defendant's asserted justification was not the actual reason for the plaintiff's non-selection and that the defendant unlawfully discriminated or retaliated against the plaintiff. *See Brady*, 520 F.3d at 494; *Smith*, 430 F.3d at 455; *Chappell-Johnson*, 574 F. Supp. 2d at 106.

The plaintiff's evidence of discrimination and retaliation falls into four categories.  First, the plaintiff contends that the defendant's asserted justification is not credible because his qualifications were "demonstrably superior" to those of the selectees.  *See* Pl.'s Opp'n at 3-14; 28-33.  Second, the plaintiff alleges that Fluman deviated from standard hiring practices by preselecting Mullikin and Haynes for their respective positions.  *Id*. at 14-18.  Third, the plaintiff relies on a handful of additional comments and actions allegedly taken by Fluman that reveal his discriminatory and retaliatory intent.  *Id*. at 18-22.  Finally, the defendant argues that an adverse inference should be drawn because of the defendant's failure to preserve and produce certain

materials relevant to this litigation.  *Id*. at 40-44.  The court addresses each of these contentions in turn.

### 1.  Qualifications Gap

The plaintiff devotes the bulk of his opposition papers to the contention that he was a more qualified candidate than either selectee.  *See* Pl.'s Opp'n at 3-14, 28-33.  The plaintiff asserts that unlike Mullikin and Haynes, he had significant supervisory and management experience, having served as the Acting Branch Chief of the Preparedness Division for eighteen months.  *Id*. at 3 & Ex. 4 ("Pl.'s VA 221 KSAs") at 2.  In that capacity, the plaintiff represented FEMA on the National Response Team, Pl.'s Opp'n at 3-4, where he "helped to formulate much of the policy that is promulgated in [NIMS]," Pl.'s VA 221 KSAs at 1.  In his KSAs, the plaintiff detailed his experience developing policy and conducting national compliance projects in connection with CHER-CAP, a hazardous materials preparedness program.  *Id*. at 1, 3.  The KSAs also reflect that the plaintiff had previously served as Section Chief for Firefighter Safety, a program designed to improve firefighter equipment.  *Id*. at 3.  The plaintiff notes that Brenda Edmond, the defendant's purported Human Resources expert, examined the plaintiff's KSAs for the VA 221 position and testified that she would have assigned him the maximum number of points for four of the five areas of evaluation and an adequate rating for the fifth category.  Pl.'s Opp'n at 4 & Ex. 5 at 134-37, 140-41.  The plaintiff maintains that this evidence demonstrates that the defendant's asserted justification for his non-selection was pretext for discrimination and retaliation.  *See* Pl.'s Opp'n at 28-33.

The defendant responds that regardless of the plaintiff's qualifications, he has presented no evidence suggesting that he was significantly better qualified than Mullikin or Haynes.  *See* Def.'s Mot. at 2-15; Def.'s Reply at 4-18.  Indeed, the defendant contends that an examination of

their relative qualifications reveals that both selectees were at least as qualified, if not more qualified, than the plaintiff.  Def.'s Mot. at 10-15.

The defendant maintains that Mullikin was "by far" the most qualified candidate for the VA 221 position.  *Id.* at 10.  The defendant notes that during Mullikin's detail from DHS, Mullikin "was focusing in on the development of compliance measurement/metrics for the implementation of [NIMS]."  Fluman Dep. at 132-33.  Furthermore, Mullikin was already working with federal, state and local subject matter experts in developing and promulgating "compliance metrics that focused around all the components of NIMS."  *Id.* at 133-34. Specifically, Fluman testified that prior to his appointment to the VA 221 position, Mullikin "was putting together plans . . . on how the compliance system would work, what type of information we would have to get out to our state and locals, when we would get it out, [and] what the compliance activities would consist of."[4]  *Id.* at 135.  Thus, the defendant argues that Mullikin was already performing the duties central to the VA 221 position at the time he applied. Def.'s Mot. at 10.

The defendant notes, and the plaintiff does not dispute, that FEMA's Human Resources Department reviewed the application materials submitted by Mullikin and the other candidates for the VA 221 position independently, without any input from FEMA managers, *id.*, Ex. 7 at 48-52, and concluded that he was among the most qualified candidates for the position, Def.'s Mot., Ex. 8 (Merit Promotion Certificate for VA 221).[5]

---

[4]       Fluman further testified that by early 2007, approximately six months after Mullikin's appointment to the VA 221 position, Mullikin's branch had developed 34 metrics for measuring NIMS compliance.  Fluman Dep. at 135-36.

[5]       Notably, Haynes, who was ultimately selected for the VA 228 position, applied for and was ranked among the most qualified candidates for the VA 221 position as well.  Def.'s Mot., Ex. 7 at 48-52 & Ex. 8.

Fluman testified that after reviewing the application materials for the pool of most qualified candidates, he selected Mullikin for the position based on his belief that

> [Mullikin] had the technical knowledge and expertise, especially in the compliance and metrics area, that was far superior [to] the other candidates. Plus, his past experience in working with the Grants and Training element in the Department of Homeland Security I felt was an extreme benefit because NIMS compliance is required in order for state and local governments to receive grant dollars.
>
> He also had management experience in managing various project teams in the development of the target capabilities at DHS. So I felt that, along with the existing work that he was doing as a detailed employee, [he] made a far superior candidate . . . than the other candidates that applied.

Fluman Dep. at 228-29.

With respect to the VA 228 position, the defendant contends that Haynes was at least as qualified as the plaintiff. The defendant notes that as with the VA 221 position, FEMA's Human Resources Department conducted an independent review of the application materials for all candidates seeking the VA 228 position. Def.'s Mot., Ex. 7 at 46-49. Based on this review, Haynes was assigned a score of 91, while the plaintiff received a score of 92. *Id*., Ex. 15 (Rating Sheet for VA 228 Candidates). As Fluman noted during his deposition, "Haynes had an extremely broad background in disaster response and recovery and . . . he was just finishing up six months of duty in Hurricane Katrina," which Fluman considered particularly noteworthy because "much of . . . where we saw NIMS going in the standards arena relates to response and recovery activities." Fluman Dep. at 226. Fluman further testified that Haynes "also had some management skills in setting up . . . our disaster recovery operation in Hyattsville, Maryland. He started that process in 1997 and worked for five or 10 years . . . from the ground up there in Hyattsville of hiring employees, budgeting . . . and so forth." *Id*. at 226-27.

The defendant notes that the members of the interview panel unanimously agreed that Haynes was the best candidate for the position.  Def.'s Mot. at 13.  Cameron, one of the interview panelists, noted Haynes's strong background and unique success developing standards in the area of claims processing.  Def.'s Mot., Ex. 18 ("Cameron Dep.") at 154-55.  Similarly, Rhodes, whom Cameron described as the "standards expert" and an individual with a detailed understanding of the duties attendant to the VA 228 position, *id*. at 155, noted Haynes's "good FEMA experience [and] management experience" and concluded that Haynes was a "strong candidate."  Def.'s Mot., Ex. 20 ("Rhodes Interview Notes") at 3.

The plaintiff contends that the defendant vastly overstates the qualifications of Mullikin and Haynes.  *See* Pl.'s Opp'n at 6-14.  With respect to the VA 221 position, the plaintiff observes that Mullikin's resume goes back only to 1995 and that Mullikin lacked supervisory experience. *Id*. at 6.  The plaintiff points out that Fluman was unable to provide specific examples of Mullikin's accomplishments during his detail from DHS.  *Id*. at 6-10.  Furthermore, the plaintiff asserts that there is little evidence that Mullikin had the requisite technical experience for the VA 221 position.  *Id*. at 7-8.

With respect to the VA 228 position, the plaintiff contends that nothing on Haynes's resume indicated that he was familiar with the setting of standards.[6]  *Id*. at 10.  The plaintiff asserts that Fluman was unable to identify any aspect of Haynes's work history that was "remotely connected to NIMS."  *Id*. at 11-13.  Specifically, the plaintiff argues that nothing about Haynes's experience with the Katrina Recovery Program indicated that he would have the knowledge necessary to implement NIMS-related standards.  *Id*. at 13.  The plaintiff further asserts that Haynes appears never to have received an undergraduate degree.  *Id*. at 12.  And the

---

[6]     As support for this contention, the plaintiff cites not to Haynes's resume, but rather to the plaintiff's own deposition testimony, in which he testified that "I couldn't find him serving on a Standards Committee when I looked at his resume."  Pl.'s Dep. at 183.

plaintiff matinains that like Mullikin, Haynes lacked any previous supervisory experience.  *Id*. at 10.

This Circuit has held that "when an employer says it made a hiring or promotion decision based on the relative qualifications of the candidates, a plaintiff can directly challenge that qualifications-based explanation only if the plaintiff was '*significantly* better qualified for the job' than those ultimately chosen."  *Adeyemi v. District of Columbia*, 525 F.3d 1222, 1227 (D.C. Cir. 2008) (quoting *Holcomb v. Powell*, 433 F.3d 889, 897 (D.C. Cir. 2006)).  As the Circuit made clear in *Adeyemi*,

> The qualifications gap must be 'great enough to be inherently indicative of discrimination.'  Only then could the fact-finder 'legitimately infer that the employer consciously selected a less-qualified candidate – something that employers do not usually do, unless some other strong consideration, such as discrimination enters into the picture.'  In cases where the comparative qualifications are close, a reasonable jury would not usually find discrimination because the jury would 'assume that the employer is more capable of assessing the significance of small differences in the qualifications of the candidates, or that the employer simply made a judgment call.'

525 F.3d at 1222 (quoting *Jackson v. Gonzalez*, 496 F.3d 703, 707 (D.C. Cir. 2007); *Aka*, 156 F.3d at 1294); *compare Jackson*, 496 F.3d at 707-08 (upholding summary judgment because the plaintiff and the selectee were both qualified for the promotion and there was no evidence that the plaintiff was a "discernibly better" candidate than the selectee) *with Aka*, 156 F.3d at 1295-99 (vacating summary judgment because the plaintiff, who had nineteen years of professional experience and multiple degrees relevant to the position, was significantly better qualified than the selectee, who had two months of volunteer experience and no relevant degrees).

In the context of promotional decisions involving government employees, the Circuit has held that

> [P]ointing to differences in qualifications that merely indicate a 'close call' does not get [a plaintiff] beyond summary judgment.  [Courts] will not reexamine

> governmental promotional decisions where it appears the Government was faced
> with a difficult decision between two qualified candidates, particularly when there
> is no other evidence [of improper motive].

*Stewart v. Ashcroft*, 352 F.3d 422, 430 (D.C. Cir. 2004) (observing that "[b]ecause courts are not

'super-personnel department[s] that reexamine[] an entity's business decision[s],' we defer to the

Government's decision of what nondiscriminatory qualities it will seek" in making promotional

decisions).

The defendant in this case has presented ample evidence that Mullikin was highly

qualified for the VA 221 position. *See* Def.'s Mot. at 2-15; Def.'s Reply at 4-18. It is

undisputed that an independent Human Resources review determined that Mullikin was among

the best qualified candidates for the position. *See generally* Pl.'s Opp'n. Nor is there any

dispute that prior to his selection, Mullikin had been detailed from DHS to develop NIMS

compliance metrics, a function central to the VA 221 position, and that in developing these

compliance metrics, Mullikin had been liaising with state and local officials, yet another central

responsibility of the VA 221 position. *See generally* Pl.'s Opp'n. Indeed, the evidence suggests

that Mullikin actually possessed more experience directly relevant to the VA 221 position than

did the plaintiff, whose compliance experience was limited to the hazardous materials arena,

Pl.'s Dep. at 114; Pl.'s KSAs at 1, 3, and who testified that he had very little input or influence in

the development of NIMS, Pl.'s Dep. at 111.

Although the plaintiff makes much of the fact that Fluman could not recall Mullikin's

specific accomplishments during his detail from DHS, Fluman did identify several specific

aspects of Mullikin's work history that he considered particularly significant, such as his

experience liaising with local officials regarding the development of NIMS compliance metrics,

his experience in grants and training programs and his experience supervising project teams.

Fluman Dep. at 228-29. Indeed, the independent Human Resources review determined that

Mullikin was among the most qualified candidates. Def.'s Mot. at 9-10.

The plaintiff's arguments regarding Mullikin's relative lack of supervisory and technical

experience similarly fail to raise a genuine issue of fact as to whether the plaintiff was a

significantly better candidate. First, the plaintiff overstates the gap between his and Mullikin's

supervisory backgrounds. *See* Pl.'s Opp'n at 5-6, 8. As previously discussed, Fluman testified

that Mullikin did, in fact, possess some supervisory experience in managing project teams at

DHS. Fluman Dep. at 228-29. Moreover, the plaintiff acknowledges receiving critical reviews

during his tenure as Acting Branch Chief of the Preparedness Division.[7] *See* Pl.'s Opp'n at 3

n.1; *see also* Def.'s Mot. at 5-6. Similarly, Fluman testified that while the plaintiff was

proficient in providing technical assistance, Mullikin was also competent to perform the

technical assistance component of the VA 221 position. Fluman Dep. at 148-50.

More fundamentally, Fluman's decision to value Mullikin's superior NIMS compliance

experience over the plaintiff's arguably superior supervisory and technical experience is

precisely the type of discretionary decision that courts may not second-guess. *See Stewart*, 352

F.3d at 429 (noting that a government employer is free to decide what non-discriminatory

qualities it finds most important when making promotional decision). The plaintiff in *Stewart*, a

highly regarded Department of Justice ("DOJ") litigator with extensive experience in complex

environmental litigation, alleged that the DOJ discriminated against him when he was passed

over for the position of Chief of the Environmental Crimes Section. *Id*. The government

---

[7]     The defendant notes that Garratt deemed the plaintiff's performance as Acting Chief "less than
expected" at times. Def.'s Mot. at 5-6 & Ex. 3 at 55-56, 82-84. In particular, one assignment that
was given to the plaintiff's branch "was turned in late, required 'a great amount of editing and
follow-up work' and Plaintiff failed to make contact with all of the individuals who needed to
assist with the project." *Id*. at 5 & Ex. 3 at 55-56. The plaintiff does not dispute these criticisms
but contends that he corrected these problems and received a "satisfactory" rating by the end of
the year. Pl.'s Opp'n at 3 n.1.

asserted that although the selectee lacked the plaintiff's litigation experience, she possessed greater management experience, and that experience in managing complex organizations was the most critical quality for the position sought. *Id.* In affirming the district court's grant of summary judgment to the government, the Circuit noted that courts must "defer to the Government's decision of what nondiscriminatory qualities it will seek in filling" vacant positions. *Id.*; *see Jackson*, 496 F.3d at 709 (holding that "[t]he fact that an employer based its ultimate hiring decision on one or more specific factors encompassed within a broader and more general job description does not in itself raise an inference of discrimination sufficient to overcome summary judgment"); *Barnette v. Chertoff*, 453 F.3d 513, 517 (D.C. Cir. 2006) (observing that "court must defer to the employer's decision as to which qualities required by the job . . . it weighs more heavily").

In this case, the evidence clearly demonstrates that NIMS compliance experience, supervisory experience and technical experience were all qualities that the defendant legitimately considered significant in deciding whom to hire for the VA 221 position. *See* Def.'s Mot. at 7-8; Pl.'s Opp'n at 4-5; VA 221 Announcement at 1. Accordingly, the court must defer to the defendant's decision to value Mullikin's NIMS compliance experience over the plaintiff's supervisory and technical experience, particularly in light of the fact that the supervisory and technical experience gap was minimal. *See Stewart*, 352 F.3d at 429. Thus, the court concludes that no reasonable factfinder could conclude that the plaintiff was a significantly better qualified candidate for the VA 221 position.

Similarly, with respect to the VA 228 position, the plaintiff has presented no evidence from which a reasonable factfinder could infer that he was significantly better qualified than Haynes. Although the plaintiff argues that nothing in Haynes's background suggested that he

had experience with the setting of standards, the evidence indicates that Haynes had previously experienced great success in developing and implementing standards in the area of claims processing and that Rhodes, the "standards expert," determined that Haynes was a strong candidate with good experience. *See* Cameron Dep. at 154-55; Rhodes Interview Notes at 3. Although the plaintiff points to Haynes's lack of NIMS-specific experience, Fluman testified that Haynes's experience in the Katrina Recovery Project was directly relevant to NIMS because response and recovery activities were "where [they] saw NIMS going in the standards arena." Fluman Dep. at 226. Moreover, given the plaintiff's admitted lack of experience in the development of NIMS and the fact that the bulk of his recent experience was limited to the hazardous materials arena, Pl.'s Dep. at 114; Pl.'s KSAs at 1, 3; Pl.'s Dep. at 111, it is far from clear that the plaintiff possessed significantly more NIMS-specific experience than did Haynes. It is, therefore, unsurprising that an independent Human Resources review of the candidates for the VA 228 position determined that based solely on their KSAs and other application materials, Haynes and the plaintiff were almost equally qualified for the position. *See* Def.'s Mot., Ex. 15.

The evidence further indicates that Haynes actually possessed more supervisory experience than did the plaintiff, having spent five to ten years setting up and managing FEMA's disaster recovery operation in Hyattsville, Maryland, where he was responsible for hiring employees, budgeting and other managerial duties. Fluman Dep. at 226-27. And as for the plaintiff's allegation that Haynes did not possess an undergraduate degree, the court concludes that this fact, standing alone, is insufficient to raise an issue of fact with respect to whether the plaintiff was significantly better qualified, given that there is no evidence that a degree was a prerequisite for the position and that Haynes was otherwise at least as qualified as the plaintiff. *See Carter v. George Washington Univ.*, 387 F.3d 872, 881 (D.C. Cir. 2004) (holding that a

reasonable jury could not conclude that the plaintiff was significantly more qualified than the selectee, despite the fact that the plaintiff had a master's degree whereas the selectee had only a bachelor's degree, because the selectee possessed more directly relevant experience); *Young v. Perry*, 457 F. Supp. 2d 13, (D.D.C. 2006) (concluding that the plaintiff failed to raise an issue of fact regarding the defendant's qualifications-based justification, despite the fact that the selectee did not have a college degree, because no advanced degrees were required for the position and the plaintiff had significant relevant experience).

The principal authority relied on by the plaintiff, *Daniels v. Tapella*, 571 F. Supp. 2d 137 (D.D.C. 2008), does not persuade the court to reach a different result.  In *Daniels*, the court held that a reasonable jury could find that the defendant's qualifications-based justification was pretextual because the plaintiff presented clear and direct evidence of discriminatory motive, the plaintiff was listed ahead of two of the selectees on the Certification of Best Qualified Candidates and the defendant offered only a "flimsy" explanation for finding the plaintiff less qualified.  571 F. Supp. 2d at 144-45.  In this case, the defendant has offered detailed and highly plausible explanations for why it considered Mullikin and Haynes more qualified than the plaintiff.  *See* Def.'s Mot. at 6-15.  And, as discussed below, the plaintiff has presented no other evidence of discriminatory intent.

Accordingly, the court concludes that no reasonable factfinder could conclude that the plaintiff was significantly better qualified than Mullikin or Haynes for their respective positions. The plaintiff's qualifications-based argument, therefore, fails to raise a genuine issue of fact regarding whether the defendant's asserted justification was pretext for unlawful discrimination and retaliation.

## 2. Preselection of Mullikin and Haynes

As further evidence of pretext and improper motive, the plaintiff contends that Fluman deviated from regular hiring procedures and preselected Mullikin and Haynes. Pl.'s Opp'n at 14-18. With respect to Mullikin, the plaintiff contends that portions of Fluman's deposition testimony suggest that he considered Mullikin's appointment to be inevitable. *Id*. at 14-17. The plaintiff also asserts that Fluman could not specify the role that Mullikin's KSAs played in his decision and did not interview anyone for the VA 221 position. The plaintiff offers testimony from his current supervisor, a branch chief with the National Integration Center, that it would be "irresponsible" to hire a Branch Chief without first conducting an interview. *Id*. at 17 & Ex. 12 at 159. With respect to the VA 228 position, the plaintiff points out that Fluman could not specify the role that Haynes's KSAs played in Fluman's decisional process. *Id*. Furthermore, the plaintiff suggests that it was improper for Fluman to interview only two candidates for the VA 228 position. *Id*. at 17-18. The defendant counters that because there was nothing improper about the selection process for either position, the plaintiff's argument fails to raise a genuine issue of material fact regarding the defendant's asserted justification for the plaintiff's nonselection. Def.'s Mot. at 9-15; Def.'s Reply at 11-13.

An employer's preselection of a job candidate, in violation of its own procedures requiring fair consideration of qualified applicants, is "undeniably relevant to the question of discriminatory intent" and may allow a factfinder to reasonably reject the employer's asserted non-discriminatory justification. *Krodel v. Young*, 748 F.2d 701, 709 (D.C. Cir. 1984). Here, however, the plaintiff has offered scant evidence that Fluman improperly preselected either candidate.

There is little evidence that Fluman preselected Mullikin for the VA 221 position. Although Fluman testified that he could not specify the exact role that the KSAs played in the

hiring decision (as compared to the resumes and other application materials), Fluman observed that "[t]he KSAs certainly play[ed] a role."  Fluman Dep. at 231.  In addition, there is no evidence that Fluman violated hiring procedures in selecting Mullikin.  Although the plaintiff suggests that not holding interviews for the VA 221 was "irresponsible," he does not controvert the testimony of Human Resources Specialist Edmond, who testified that under applicable federal guidelines, after a manager receives a certificate of eligible candidates from the Human Resources Department, the manager "has the option to set up interviews or make a selection from any candidate on that listing."  Edmond Dep. at 52-53.

Moreover, the plaintiff's own opposition papers plainly indicate that any favoritism shown to Mullikin in the selection process resulted from the fact that he was viewed as a uniquely well-qualified candidate based on his detail from DHS.  *See* Pl.'s Opp'n at 14-18. Courts in this jurisdiction have held that "[e]ven if there ha[s] been favoritism in the selection process . . . '[p]reselection . . . does not violate Title VII when such preselection is based on the qualifications of the party and not on some basis prohibited by Title VII.'"  *Nyunt v. Tomlinson*, 543 F. Supp. 2d 25, 39 (D.D.C. 2008) (quoting *Goostree v. Tennessee*, 796 F.2d 854, 861 (6th Cir. 1986)); *accord Oliver-Simon v. Nicholson*, 384 F. Supp. 2d 298, 310 (D.D.C. 2005) (holding that the "plaintiff's pre-selection claim does not advance her case for pretext unless she produces some evidence that discrimination played a role in [the selectee's] pre-selection and thus the plaintiff's non-selection"); *Pearsall v. Holder*, 2009 WL 1133364, at *12 n.12 (D.D.C. Apr. 28, 2009) (granting summary judgment to the employer in part because the plaintiff "offers no evidence from which a reasonable factfinder could conclude that [the selectee] was preselected for discriminatory reasons").

The thrust of the plaintiff's preselection argument is that in selecting Mullikin, Fluman "'relied on' the fact that Mr. Mullikin 'was performing compliance metrics duties in relationship to the implementation of [NIMS] in an acting capacity,' while also relying upon Mr. Mullikin's now misplaced KSAs and resume." Pl.'s Opp'n at 14 (quoting Fluman Dep. at 375). Thus, even if Mullikin was preselected for the position, the plaintiff himself acknowledges that any preselection was based on Mullikin's perceived unique qualifications for the position rather than on any discriminatory motive. *Id*. at 14-15.

The only evidence of Haynes's preselection was Fluman's "admitted haziness" concerning the role that the KSAs played in his selection. *See* Pl.'s Opp'n at 16-18. The plaintiff offers no evidence that it was improper for Fluman to interview only two candidates for the VA 228 position – indeed, the plaintiff does not dispute Edmond's testimony that under federal guidelines, Fluman was not required to conduct any interviews after receiving the list of best qualified candidates. *See* Edmond Dep. at 52-53. Finally, the plaintiff acknowledges that there was significant doubt among the interview panelists regarding which of the two remaining candidates for the VA 228 position would ultimately prevail, undermining the plaintiff's assertion that Haynes's appointment was preordained. *See* Pl.'s Opp'n at 12-13 (citing Cameron Dep. at 152). No reasonable factfinder could infer on the basis of these facts that Fluman preselected Haynes for the VA 228 position. Accordingly, the court concludes that the plaintiff's allegations of preselection do not raise a genuine issue of material fact regarding the defendant's proffered non-discriminatory and non-retaliatory justification for the plaintiff's non-selection.

### 3. Other Acts of Discrimination

The plaintiff points to a handful of other incidents that allegedly reveal Fluman's discriminatory and retaliatory intent. The plaintiff avers that Fluman implied that the plaintiff's

view of preparedness was "old-fashioned" and that his years at FEMA "counted against him." Pl.'s Opp'n at 18. The plaintiff also contends that Fluman further displayed disrespect by excluding him from certain meetings, "crossing out the 15 [grade level] on [the plaintiff's] evaluation and replacing it with a 14" and issuing assignments directly to the plaintiff's assignees. *Id*. at 19-20. Finally, the plaintiff suggests that Fluman had a particular "interest" in "young people" and rarely interacted with older men. *Id*. at 18-19.

In response, the defendant contends that the plaintiff has presented no evidence that any of these incidents had any connection to the plaintiff's age or involvement in protected activity. Def.'s Mot. at 21-24; Def.'s Reply at 18-19. Accordingly, the defendant argues that these allegations do not support an inference of unlawful intent. Def.'s Reply at 18-19. The court addresses each of the plaintiff's allegations in turn.

The sole basis for the plaintiff's allegation that Fluman implied that his experience was "old fashioned" is the plaintiff's own deposition testimony in which he states that "[m]y expertise was in preparedness and response to natural disasters. I believe that Fluman viewed that as old-fashioned in that that didn't comport with what he thought the new FEMA was going to be about." Pl.'s Dep. at 238; *see* Pl.'s Opp'n at 18. The plaintiff does not assert that Fluman actually used the term "old fashioned" or "old" or that Fluman ever expressed to anyone that the plaintiff's expertise was no longer relevant. *See id*. This allegation, lacking any factual support beyond the plaintiff's perception of some unspecified incident or attitude exhibited by Fluman, does not raise a genuine issue of fact regarding Fluman's wrongful intent. *See Holcomb*, 433 F.3d at 899 (observing that allegations that mischaracterize the record and are without evidentiary support cannot support an inference of unlawful animus).

Likewise, the sole basis for the plaintiff's allegation regarding his years at FEMA "counting against him" is his conviction, unsupported by any facts, that Fluman believed that his expertise in disaster response "[did] not work into the new thrust of FEMA, which is terrorism preparedness.  So, I interpreted that as meaning, well, the years that you have spent doing this not only count for you, it counts against you."  *Id.* at 161.  Again, the plaintiff does not allege that Fluman ever expressed to anyone that the plaintiff's years at FEMA were irrelevant or "counted against him."  *See id.*  Indeed, the plaintiff acknowledges elsewhere that FEMA's focus did, in fact, shift away from disaster preparedness to terrorism response, Pl.'s Dep. at 49, 51, and that this shift in focus resulted in a substantial change in his own duties due to the reallocation of funding and the creation of DHS, *id.* at 56-59.  Under these circumstances, it would be unreasonable to infer discriminatory intent from any statement that the plaintiff's expertise had a reduced significance in light of FEMA's new focus on terrorism.

The allegations regarding the plaintiff's exclusion from meetings, the alteration of his evaluation sheet and the assignment of work directly to his staff fair no better, as the plaintiff has presented no evidence whatsoever suggesting any link between these actions and the plaintiff's age or involvement in protected activity.[8]  *See Ginger v. District of Columbia*, 527 F.3d 1340, 1345-46 (D.C. Cir. 2008) (holding that the plaintiffs failed to raise a genuine issue of fact

---

[8]  Although the plaintiff fails to specify when any of these alleged incidents occurred, it appears that they predate his non-selection for the VA 221 position, *see* Pl.'s Opp'n at 18-22, when the plaintiff first announced his intention to file an EEO complaint, *see id.* at 38, undermining any inference of retaliatory intent.  The plaintiff attempts to circumvent this fact by arguing that "although the competition and selection for the VA 228 position had been for a GS 14 position, Mr. Fluman . . . selected Mr. Haynes for a GS 15 position" after the plaintiff filed his EEO complaint.  *Id.* at 35-36.  The plaintiff alleges that his exclusion from consideration for this "separate" GS 15 position constituted a retaliatory act.  *Id.* at 35-36.  This argument is devoid of merit, as the evidence clearly demonstrates that there was not a separate GS 15 position distinct from the VA 228 position.  To the contrary, the VA 228 Announcement issued in April 2006 states that that position was at a "GS 14/15" grade level.  VA 228 Announcement at 1.  Fluman ultimately chose to appoint Haynes to the VA 228 position at a GS 15 grade level.  Pl.'s Opp'n, Ex. 16.

regarding the defendant's non-discriminatory justification because they "adduced no evidence whatsoever of a causal link between race" and the adverse actions to which they were subjected). To the contrary, the plaintiff testifies that the meetings to which he was not invited focused on terrorism preparedness activities and that his exclusion resulted from the fact that his experience "was out of fashion with the new FEMA."  Pl.'s Dep. at 57.  Similarly, the assignments given directly to his staff without his knowledge were specifically related to "counter terrorism activities."  *Id.*  Thus, the plaintiff's own testimony indicates that these actions were premised not on his age or involvement in EEO activity, but on his lack of specific expertise in FEMA's new area of focus.

It is, of course, theoretically possible that the plaintiff's supervisors used his lack of experience with terrorism response to mask the true discriminatory intent underlying these actions.  The plaintiff, however, has presented no evidence on this score.  *See generally* Pl.'s Opp'n.  The actions about which the plaintiff complains did not focus on the plaintiff's age or protected activity and reflected acknowledged changes in FEMA's focus.  *See* Pl.'s Dep. at 49, 51-59.  Under these circumstances, no reasonable factfinder could conclude that these actions support an inference of unlawful intent.

The closest the plaintiff comes to articulating a basis for inferring discrimination is his allegation regarding Fluman's "interest" in "young people" and lack of interaction with "really older men," *see* Pl.'s Opp'n at 18-19.  Yet the deposition testimony of Carol Cameron, on which the plaintiff bases these allegations, indicates that Fluman's interest in young people "was an interest in the fact that they were young people and you know he liked to coach and mentor young people."  *See* Pl.'s Opp'n at 18-19 (quoting Cameron Dep. at 135).  Nothing in this testimony suggests that Fluman's interest in mentoring young people reflected hostility or

animus toward older people.  *See id.*  Furthermore, Cameron did not testify that Fluman avoided

working with "really older men," but rather that she "pretty much just saw how he interacted

with the Branch Chief . . . and you know whoever was doing those other jobs like Bill Rhodes,

and you know people that were doing those positions."  Cameron Dep. at 164.  Although these

allegations, construed in the light most favorable to the plaintiff, could be interpreted as

circumstantial support for the contention that Fluman preferred younger people to older people,

they are, standing alone, insufficient to raise a genuine issue of fact regarding the defendant's

asserted justification, particularly in light of the absence of any other evidence of discriminatory

intent.  *Cf. Stewart*, 352 F.3d at 431 (concluding that the plaintiff failed to raise a genuine issue

of fact regarding the defendant's non-discriminatory justification because the only evidence

presented by the plaintiff that race played a factor in his non-selection was the speculative and

unpersuasive testimony of a co-worker, who testified that she "could not know" what role race

played in the promotional decision).  Accordingly, the court concludes that a reasonable

factfinder could not infer on the basis of these isolated incidents and comments that the

defendant's asserted justification for the plaintiff's non-selection was pretext for discrimination

or retaliation.[9]

---

[9]     Although in his complaint, the plaintiff asserts that these actions constitute independent acts of
disparate treatment, *see* Compl. ¶¶ 57-65, in his opposition, the plaintiff draws on these
allegations solely as evidence of pretext related to his non-selection claims, *see* Pl.'s Opp'n at 18-
22, 33. Regardless, to the extent that the plaintiff asserts an independent claim of age
discrimination on these actions, the court grants summary judgment to the defendant, as none of
these actions is connected to the plaintiff's race, *see Ginger v. District of Columbia*, 527 F.3d
1340, 1345-45 (D.C. Cir. 2008), or sufficiently adverse to support an independent claim of
discrimination, *see Taylor v. Small*, 350 F.3d 1286, 1292-93 (D.C. Cir. 2003) (observing that
"[a]n 'adverse employment action' within the meaning of *McDonnell Douglas* is a 'significant
change in employment status, such as hiring, firing, failing to promote, reassignment with
significantly different responsibilities, or a decision causing significant change in benefits'").

### 4. Adverse Inference

Finally, the plaintiff asks the court to draw an adverse inference in his favor because the defendant failed to preserve and produce the case file for the VA 221 hiring process and the interview notes of Fluman and Cameron in connection with the VA 228 hiring process. Pl's Opp'n at 40. The plaintiff observes that although the defendant was on notice as early as May 24, 2006 (when the defendant first contacted the EEO office) that the VA 221 file needed to be preserved, the defendant inexplicably "misplaced" the file. *Id.* at 40-41. As a result of the defendant's failure to preserve the VA 221 file, the plaintiff requests that the court draw the adverse inference that Mullikin never submitted KSAs for the position, which would underscore his allegation that Fluman preselected Mullikin. *Id.* at 42. The plaintiff does not specify precisely what adverse inference should be drawn from the defendant's failure to preserve the interview notes in connection with the VA 228 position, but suggests that these documents could contain information undermining the defendant's claims regarding Haynes's qualifications. *See id.* at 21-22.

The defendant contends that an adverse inference is unwarranted in this case because there is no evidence that the materials in question were deliberately destroyed. Def.'s Reply at 19-21. The defendant argues that because the plaintiff has not been prejudiced by his inability to review these files, summary judgment should not be precluded for this reason. Def.'s Reply at 19-21.

An adverse inference is warranted if the following three elements are satisfied:

(1) [T]he party having control over the evidence had an obligation to preserve it when it was destroyed or altered; (2) the destruction or loss was accompanied by a 'culpable state of mind'; and (3) the evidence that was destroyed or altered was 'relevant' to the claims or defenses of the party that sought the discovery of the spoliated evidence, to the extent that a reasonable factfinder could conclude that the lost evidence would have supported the claims or defense of the party that sought it.

*Bolger v. District of Columbia*, 2009 WL 841137, at *18-19 (D.D.C. Mar. 31, 2009) (citing

*Mazloum v. D.C. Metro. Police Dep't*, 530 F. Supp. 2d 282, 291 (D.D.C. 2008)).

The defendant plainly had an obligation to preserve the missing notes and files at least

once the plaintiff initiated his EEO action.  *See Arista Records, Inc. v. Sakfield Holding Co.*, 314

F. Supp. 2d 27, 34 n.3 (D.D.C. 2004) (observing that once a complaint is filed, a litigant is under

a duty to preserve what it knows or reasonably should know is relevant to the action).  Indeed,

the defendant does not dispute that it was under a duty to preserve these materials.  *See generally*

Def.'s Reply.

It is equally clear that the defendant is culpable for its failure to preserve the files.  The

defendant has offered no explanation whatsoever for its failure to preserve these materials.  *See*

*generally* Def.'s Reply.  Although the defendant argues that an adverse inference may be drawn

only if there is evidence of bad faith, "a court may employ an adverse inference due to a party's

'failure to preserve evidence,' even if deliberate or reckless conduct is not present."  *More v.*

*Snow*, 480 F. Supp. 2d 257, 274-75 (D.D.C. 2007); *Mazloum*, 530 F. Supp. 2d at 292 (noting that

"the adverse inference doctrine embraces negligent (in addition to deliberate) destruction of

evidence").  The defendant's inexplicable negligence in failing to preserve the files satisfies the

second necessary element.

It is, however, far less clear that a reasonable factfinder could conclude that the lost

evidence would have supported the plaintiff's claims.  With respect to the VA 221 file, the

plaintiff asserts that this evidence would have supported his preselection allegation because

Mullikin may have submitted inadequate KSAs for that position.  Pl.'s Opp'n at 42.  As an initial

matter, the questions on the VA 221 KSA questionnaire were largely identical to those on the

VA 228 KSA questionnaire, *see id.*, Ex. 4 & Ex. 6, and Mullikin's KSAs for the VA 228 position

were produced to the plaintiff.  *See id*. at 42.  Indeed, the plaintiff's own KSAs for the two

positions were largely identical.  *See id*., Ex. 4 & Ex. 6.  Similarly, the fact that FEMA's Human

Resources Department independently determined that Mullikin was among the most qualified

candidates casts significant doubt on the plaintiff's claim that no KSAs were submitted.

      Moreover, as previously discussed, the plaintiff's preselection claim lacks merit because

the plaintiff has presented no evidence that the favoritism shown to Mullikin resulted from a

discriminatory motive rather than his unique qualifications for the position.  *See* Pl.'s Opp'n at

14-18.  Thus, even if the court were to draw the adverse inference suggested by the plaintiff, it

would not alter the court's determination absent some evidence of discriminatory intent.  The

court will not withhold summary judgment on these grounds.  *See Chappell-Johnson*, 574

F. Supp. 2d at 102 (noting that "when all evidence in the record supports a legitimate, non-

discriminatory reason for her non-selection, no reasonable jury could award damages against her

employer based *solely* on *speculation* as to what *might* be contained in documents *not in

evidence*").

      Similarly, the plaintiff has failed to articulate how the missing interview notes for the VA

228 position could have altered the outcome of this litigation, given that the plaintiff had already

been excluded by the time these notes were taken and that all three interview panelists concluded

that Haynes deserved the position.  *Cf. id*. (holding that the defendant's failure to preserve

interview notes did not preclude summary judgment because it was unreasonable to assume that

those interview notes would have supported the plaintiff's claims given that both interviewers

testified that they considered the selectee the superior candidate).  Furthermore, the defendant

has already produced the VA 228 application materials, encompassing the materials that were

before Fluman at the time he chose not to interview the plaintiff for that position.  *See* Pl.'s

Opp'n at 42-43.

Thus, the court declines to withhold summary judgment based on the defendant's failure

to produce the materials identified by the plaintiff.  *See Von Muhlenbrock v. Billington*, 579

F. Supp. 2d 39, 45 (D.D.C. 2008) (observing that "destruction of evidence, standing alone, is

[not] enough to allow a party who has produced no evidence – or utterly inadequate evidence –

in support of a given claim to survive summary judgment on that claim") (quoting *Chappell-*

*Johnson*, 574 F. Supp. 2d at 102).  Accordingly, the court concludes that the plaintiff has not

produced sufficient evidence for a reasonable factfinder to conclude that the defendant's asserted

non-discriminatory and non-retaliatory reason for his non-selection was pretext and the

defendant unlawfully discriminated or retaliated against him.  *See Brady*, 520 F.3d at 494.


## IV.  CONCLUSION

For the foregoing reasons, the court grants the defendant's motion for summary

judgment.  An Order consistent with this Memorandum Opinion is separately and

contemporaneously issued this 22nd day of June, 2009.


RICARDO M. URBINA
United States District Judge